|  |  |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 |  |
| 6 |  |
| 7 |  |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| **K. JAMEL WALKER,** | 96cv609 PCL |
|---|---|
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT** |
| v. |  |
| **JAMES GOMEZ, et al.,** |  |
| Defendants. |  |

**I.**

**INTRODUCTION**

K. Jamel Walker first sued Defendants for unlawful discrimination in violation of the Equal Protection clause of the U.S. Constitution in April 1996. (Doc. No. 1.) Now, more than twelve years later, after a favorable Ninth Circuit ruling in a published opinion, countless motions, dozens of conferences, an eventual settlement between the parties, a relocation to a different prison, and seemingly the opportunity to tranquilly serve his life-sentence, Plaintiff renews his original allegations. He claims that the California Department of Corrections and Rehabilitation, in violation of their settlement agreement with Walker, continues to discriminate based on race as a policy, has discriminated against him based on his race, and has retaliated against him for his success in the courtroom against Defendants.

After extensive briefing, an evidentiary hearing, oral arguments, and careful deliberation, the Court determines Walker has not shown Defendants violated the terms of the Settlement Agreement under applicable law. Although Walker has been subjected to prison lockdowns and has had privileges restricted for a short period of time on three occasions, these actions do not rise above the level required for a violation of the Settlement Agreement between the parties. Moreover, Walker's claim of retaliation is unfounded. Therefore, the Court finds that relief with respect to Plaintiff's Motion to Enforce Settlement Agreement and for Monetary Sanctions is DENIED.

## II.

## BACKGROUND

K. Jamel Walker ("Plaintiff" or "Walker"), a black inmate serving a life sentence in California, was imprisoned at Calipatria State Prison. In May of 1996, Walker brought suit against the California Department of Corrections ("CDCR") and several named parties claiming a denial of his right to equal protection because, during three prison lockdowns, he was not allowed to resume his prison job until after similarly situated inmates of other races. Walker v. Gomez, 370 F.3d 969, 970 (9th Cir. 2004).

Following a grant of summary judgment for Defendants and a subsequent favorable Opinion from the Court of Appeals for the Ninth Circuit, on remand Plaintiff resumed litigation and the parties reached a settlement which became effective July 4, 2006. (Doc. No. 307 Mot. Ex. A.) As part of the Settlement Agreement ("Agreement"), Walker would be transferred from Calipatria State Prison to Mule Creek State Prison and would be paid a sum of $10,300. (Id. Ex. A ¶ 1, 2.) Additionally, the agreement contains three provisions at issue in this proceeding.

    4.    The CDCR and all Defendants acknowledge that section 3084.1(d) of Title 15 of the California Code of Regulations states: No reprisal shall be taken against an inmate or parolee for filing an appeal. The CDCR and all Defendants further acknowledge that section 3084.1(d) of Title 15 is applicable to Walker and agree he has a right to be free from any form of reprisal or retaliation for exercising his rights in filing the inmate appeals in this matter, for filing and prosecuting this lawsuit, or for procuring this Agreement. Thus, no retaliation will be taken against Walker in connection with his activity in this lawsuit.

    5.    The Parties enter this Agreement, in part, because the CDCR, through its current administration, is committed to moving and is moving towards a

|   |   |
|---|---|
| 1 | behavior based system of accountability, where each inmate will be held accountable for his own individual conduct. Each inmate is to be held accountable for his own conduct, not that of other inmates of the same race. The CDCR adopted a goal to help reach this end, attached as Exhibit A to this Agreement and incorporated here by reference. |
| 4 | 6.   The CDCR and all Defendants also acknowledge that section 3004(c) of Title 15 of the California Code of Regulations mandates, in part, that inmates will not be subjected to any form of discrimination because of race. The CDCR and all Defendants further acknowledge that section 3004(c) is applicable to Walker and agree he has a right not to be discriminated against on the basis of race. Thus, the CDCR will not discriminate against Walker on the basis of race. |

(Id. Ex. A ¶ 4, 5, 6.) The Agreement was made final following a Settlement Disposition Conference held on August 30, 2006 and the parties filed a Joint Stipulation to Dismiss Action With Prejudice on September 11, 2006. (Doc. Nos. 282, 283.)

Pursuant to the terms of the Agreement, Plaintiff was transferred to Mule Creek State Prison on April 12, 2006. (Doc. 317 Evid. Hr'g Tr. 7:8.) Beginning October 2006, Plaintiff alleges he began to experience discrimination on the basis of race during lockdown periods following violent attacks between inmates. (Doc. 307 P. & A. 3.) More specifically, Plaintiff sets forth the following allegations:

> In October 2006, Mule Creek State Prison ("Mule Creek") placed all Black inmates on lockdown because one black inmate assaulted another Black inmate. [Footnote omitted.] The assault occurred on October 9, and two days later, all non-Black inmates were returned to normal program while the Black inmates, as well as all non-Black inmates housed with Black inmates, remained on lockdown. As a result, Mr. Walker was denied access to work for two days and part of a third day. [Citation to record omitted.]
>
> In February 21, 2007, all Facility A inmates (where Mr. Walker is housed) were placed on lockdown because of a disturbance involving nine Black and Hispanic inmates that was not racially motivated. [Citation to record omitted.] According to the Program Status Report, all inmates were placed on lockdown but only "White and Other[]" critical workers were allowed to return to work. [Citation to record omitted.]
>
> On October 19, 2007, one Mule Creek inmate seriously injured another. [Citation to record omitted.] Despite the limited scope of the incident, Black and Hispanic critical workers were kept from returning to work. [Citation to record omitted.] Blacks and Hispanics were not allowed normal visits. [Citation to record omitted.]

(Id.)  Plaintiff also claims knowledge of various instances at Calipatria State Prison where inmates' privileges were restricted on the basis of race following lock-down procedures. (Id. at

1    2-3.)

2    Additionally, Plaintiff claims Defendants have not adhered to the terms of Paragraph five of
3    the Agreement because they have not yet implemented a "behavior based system of
4    accountability" where each inmate is held accountable for their personal actions and not
5    restricted in their privileges and activities on the basis of race. (Id. at 3.)

6    Lastly, Plaintiff alleges his counselor at prison, Ms. Michelle Hamilton, has retaliated
7    against him in direct violation of the terms of Paragraph four of the Agreement. (Id.) To
8    support this allegation, Plaintiff points to an instance where Ms. Hamilton asked Plaintiff if he
9    would volunteer for a transfer to High Desert State Prison. (Id.) Plaintiff also states Ms.
10   Hamilton has monitored confidential calls between Plaintiff and his attorney and asked questions
11   regarding the content of those calls. (Id.)

12   Plaintiff filed a Motion to Enforce Settlement Agreement and for Monetary Sanctions on
13   March 27, 2008. (Doc. No. 307.) Defendants filed an Opposition to the Motion on April 14,
14   2008 (Doc. No. 315) and Plaintiff replied on April 25, 2008. (Doc. No. 318.) On May 2, 2008,
15   the Court granted a Joint Stipulation to Stay Proceedings while the parties attempted to negotiate
16   a settlement or resolution to the Motion. (Doc. No. 320.) As no resolution resulted from these
17   extended negotiations, the Motion was submitted to the Court on May 23, 2008. (Id.)

18                                         **III.**

19                                     **JURISDICTION**

20   As part of the original Agreement signed on July 4, 2006, the parties stipulated that this
21   Court retain jurisdiction for the purpose of enforcing the Settlement Agreement. The preamble
22   to the Agreement states, in relevant part: "The Parties request and have stipulated that Magistrate
23   Judge Lewis retain jurisdiction for purposes of enforcing this settlement." (Agreement ¶ 15.) In
24   addition, the parties signed a Consent to Jurisdiction by a United States Magistrate Judge form
25   whereby they agreed to have "all disputes arising out of the terms of the settlement agreement"
26   decided by Magistrate Judge Lewis. (Doc. No. 298 Ex. B.) This form also states: "[A]ny
27   decision by the Magistrate Judge regarding any such dispute[] shall be FINAL AND BINDING,
28   WITH NO APPEAL." (Id.) (emphasis in original). As such the Motion is properly before the

undersigned pursuant to Local Rule 72.1(g) for determination on the merits.

## IV.

## LEGAL STANDARD

For the purposes of construction and enforcement, settlement agreements are "governed by principles of local law which apply to interpretation of contracts generally." United Commercial Ins. Serv., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992) (quotations omitted). Moreover, the parties have expressly agreed to the applicable law for the purposes of enforcing the settlement agreement at issue:

> 16. This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

(Agreement ¶ 16.) Therefore, as California courts have previously held, because a settlement agreement is a contract, "the legal principles which apply to contracts generally apply to settlement contracts." Weddington Productions, Inc. v. Flick, 60 Cal. App. 4th 793, 810 (1998).

California courts generally "interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made." Lloyd's Underwriters v. Craig & Rush, Inc., 26 Cal.App.4th 1194, 1197-1198 (1994). Settlement contracts "must receive such an interpretation as will make [them] lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Cal. Civ. Code § 1643. Moreover, "where one construction would make a contract unusual and extraordinary and another construction, equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail." Sayble v. Feinman, 76 Cal. App. 3d 509, 513 (1978). "The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." Strong v. Theis, 187 Cal. App. 3d 913, 920 (1986). In cases of uncertainty not removed by applicable rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. See Cal. Civ. Code § 1654.

Additionally, the trial court is not authorized to create the material terms of a settlement

agreement. <u>Weddington Productions</u>, 60 Cal.App.4th at 810. A contract will be enforced if it is sufficiently definite for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. <u>Ersa Grae Corp. v. Fluor Corp.</u>, 1 Cal.App.4th 613, 623 (1991). "There are occasions in which 'minor matters' in elaborate contracts are left for future agreement. When this occurs, it does not necessarily mean that the entire contract is unenforceable." <u>Weddington Productions</u>, 60 Cal.App.4th at 813. "Stated otherwise, the contract will be enforced if it is possible to reach a fair and just result even if, in the process, the court is required to fill in some gaps." <u>Ersa Grae Corp.</u>, 1 Cal.App.4th at 623.

Moreover, under California law, courts seek to establish the parties' intent from the contract's language: "[t]he paramount rule governing the interpretation of contracts is to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as it is ascertainable and lawful. The intention of the parties must, in the first instance, be derived from the language of the entire contract." <u>Royal Thrift and Loan Co. v. County Escrow, Inc.</u>, 123 Cal. App. 4th 24, 45 (2004) (quotations omitted).

## V.

## DISCUSSION

Plaintiff makes three arguments in support of his contention that Defendants have violated the terms of the Settlement Agreement. First, he argues Defendants have discriminated against him on the basis of his race or ethnicity by restricting his privileges for approximately ten days during lockdowns at Mule Creek following violent altercations between inmates. (P. & A. 4.) Second, he argues Defendants have not successfully implemented policies and procedures within the prison system which hold inmates accountable for their own individual conduct rather than institute prison-wide lockdowns based on race. (<u>Id.</u> at 5.) Third, he argues Defendants have retaliated against him for his participation in the instant litigation by asking if he wished to transfer to another prison that caters to his "sensitive needs" and by monitoring his private telephone calls with counsel. (<u>Id.</u> at 9-12.) The Court examines each allegation in turn.

### A. **Discrimination on the Basis of Race**

Plaintiff argues that discrimination against him on the basis of his race occurred when,

following three lockdowns, he was not allowed to return to work at the same time as other inmates of different races. Plaintiff generally contends that when Black inmates are involved in the violent acts that precipitate the lockdowns, Black inmates' activities are restricted for longer periods of time and he is not allowed to return to work or resume normal programs during this time. Defendants counter that such restrictions are necessary upon some or all inmates because prison staff require a minimum amount of time to conduct investigations and cell searches to eliminate possible danger to inmates of the same race as those involved. Defendants further contend that no discrimination against Plaintiff occurred because all inmates are initially placed on lockdown until the situation is contained. Following containment, inmates of certain races are removed from the restrictive "list" as the investigation clears the possibility of danger to them.

Under applicable law, the Court must interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used. Lloyd's Underwriters, 26 Cal.App.4th at 1197-1198. Here, the parties' Settlement Agreement contains the following provision at Paragraph 6:

> 6. The CDCR and all Defendants also acknowledge that section 3004(c) of Title 15 of the California Code of Regulations mandates, in part, that inmates will not be subjected to any form of discrimination because of race. The CDCR and all Defendants further acknowledge that section 3004(c) is applicable to Walker and agree he has a right not to be discriminated against on the basis of race. Thus, the CDCR will not discriminate against Walker on the basis of his race or ethnicity.[1]

Cal. Civ. Code § 1644 requires contract language to be given its ordinary meaning, unless it is clear the parties intended a special meaning. The Agreement further states:

---

1. A literal reading of this provision of the Agreement renders Section 3004(c) of Title 15 of the California Code of Regulations incorporated by reference. Section 3004(c) states: "(c) Inmates, parolees and employees will not subject other persons to any form of discrimination because of race, religion, nationality, sex, political belief, age, or physical or mental handicap." Subsection 3004(c) is part of the California Code of Regulations Title that regulates Crime Prevention and Corrections. This particular subsection is found under Article 1 of this Title which is specifically titled "Behavior" and is likely determined to set forth regulations applying to the behavior of those involved within the prison system. Moreover, § 3004 is titled "Rights and Respect of Others." However, it does not appear that § 3004(c) mandates any particular procedure or policy within the prison, much less with respect to prison lockdowns following violent altercations between inmates.

> 13. The language of this Agreement is the result of negotiations of the Parties to the extent that no one party has drafted this Agreement, and no presumption shall arise from the drafting of all or any part of the language in this Agreement.

With no presumption in existence as to the meaning of this provision, the Court looks to the "ordinary meaning of the language used" to determine whether the Agreement covers the behavior alleged by Walker. To determine the ordinary and popular meaning of a word, the court will typically consult a dictionary. People ex rel Lockyer v. R.J. Reynolds Tobacco Co., 116 Cal.App.4th 1253, 1263 (2004).

The definition of "discrimination" as given by Black's Law Dictionary is:

> 1. The effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of race, age, sex, nationality, religion, or handicap.
> 2. Differential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.

Black's Law Dictionary (8th ed. 2004) In taking the term "differential treatment" and applying it to the instant situation, the Court cannot conclude that "no reasonable distinction can be found between those favored and those not favored." Plaintiff would place himself with those "not favored" and those "favored" would be inmates who were allowed to return to work before him. However, Plaintiff admits that during the lockdown proceedings, all inmates remained on restricted programs initially until various groups were cleared while investigations concluded. (P. & A. 3) ("In February 21, 2007, all Facility A inmates (where Walker is housed) were placed on lockdown because of a disturbance involving nine Black and Hispanic inmates that was not racially motivated.")(See also Id. Ex. C.)(Program Status Report–Initial Lockdown, Inmates Affected: All.) Therefore, it would appear that "those favored," i.e. those inmates that were removed from restricted lockdown before Walker, were those who had been cleared of any involvement from the results of the ensuing investigations. Discrimination, under the ordinary meaning of the term, requires that no reasonable distinction be found between two similarly situated inmates. Here, a reasonable distinction exists between Plaintiff and those inmates that were allowed to return to work before him because those inmates had been cleared through the ensuing investigation whether it be on the basis of their housing unit, race or lack of personal involvement in the violent offense.

|   |   |   |
|---|---|---|
| 1 | | Moreover, Captain Machado testified at the Evidentiary Hearing that such investigations, |
| 2 | and the lockdown procedures required to conclude them, are prompted by the necessity to ensure |
| 3 | the security of the yard and prison facilities following violent actions by and against inmates. |
| 4 | Captain Machado stated: |
| 5 | A: | A lot of times when we have our meetings with the warden, and based on intelligence that we get, we can either start with our yard facilities or we |
| 6 | | start with the housing units and do cell-by-cell searches for dangerous contraband and weapon type stock. |
| 7 | Q: | And do you need to have inmates confined to their cells while you're doing that? |
| 8 | A: | Oh, yes. |
|   | Q: | And what's the reason for that? |
| 9 | A: | It's based on security issues. We don't–we're trying to figure out what we have. We want to try to–if there's a propensity for further violence, if |
| 10 | | there's weapons, we want to make a concerted effort to make these discoveries, so when I report to the warden I can report to him our findings |
| 11 | | and we can safely open the yard up. So that's our whole goal right there, to make sure the yard is safe to open up. |
| 12 | Q: | Okay. |
|   | A: | And the inmates can peacefully co-exist together. |
| 13 | Q: | All right. And so that's based on information regarding risk that you get from conducting interviews and searches and things like that; is that right? |
| 14 | A: | Yes. Yes. |
| 15 | (Evid. Hr'g Tr. 113:17-114:14.)  This bolsters Defendants' contention that Plaintiff is not |
| 16 | "denied privileges" solely on the basis of his race but rather on a general level along with other |
| 17 | similarly situated inmates as members of certain races are investigated for involvement in the |
| 18 | altercations.  Plaintiff agrees that investigations follow violent episodes within the prison and |
| 19 | take place during lockdown periods.  Plaintiff testified to the following at the Evidentiary |
| 20 | Hearing: |
| 21 | Q: | Do you recall–well, yeah. Do you recall being asked questions by correctional officers regarding whether or not you had any type of |
| 22 | | information concerning if the incident was just one on one or if there was going to be future violence, things of that nature? |
| 23 | A: | When I say I can't recall, there's been several different lock-downs, and there's been times when they called–they've done interviews, random |
| 24 | | interviews, and there's been times they haven't done random interviews. So I can't say that specific date that I was actually called. |
| 25 | Q: | But you acknowledge that sometimes during the lockdowns, they do go from cell to cell asking inmates if they have information about the incident |
| 26 | | that just happened, right? |
| 27 | A: | They actually pull us out and bring us in the office, but yes, they do that from time to time. |
| 28 | Q: | Okay. And do you also agree that from time to time during these types of incidents, they do pull you out of a cell and conduct a search of every inmate, right? |

A:     Yes.

(Evid. Hr'g Tr. 69:24-70:18.)  This indicates that Defendants' purpose for placing Plaintiff under restrictive lockdown and not releasing him to work as early as they may have released others rests on the need to conduct an investigation or search and not on the basis of Plaintiff's race. Prison security and discipline are the only purposes cited for the initial race-based lockdown periods.

Additionally, Plaintiff acknowledges that inmates of other races not involved in the altercations were kept on restrictive lockdown longer than other inmates if their cellmate was a member of the race of inmates involved.  Plaintiff testified to the following:

> Q:     What race is your roommate?
> A:     He's Asian.
> Q:     Why was he affected?
> A:     Because he's housed in a cell with me. And the way kind of it has worked for quite some years is that if a particular race is on lock-down and an inmate–let's say, for example, the blacks are on lock-down and you're in a cell with a black, and you happen to be of another race. You will be on lock-down as well because you actually live in the cell with a guy of the particular race that's on lock-down.

(Evid. Hr'g Tr. 26:2-12.)  Plaintiff's testimony further corroborates the fact that race of a particular inmate is not the factor upon which inmates are kept on restrictive lockdown.  This can only mean that the basis for maintaining the restrictions in place as to certain inmates is location and conclusion of interviews and searches, among other factors possibly including race.  With these facts, the Court cannot conclude that Defendants harbored discriminatory intent solely against Plaintiff in an effort to keep him under restricted lockdown far longer than other inmates.

Lastly, even if a very literal interpretation of Paragraph Six of the Agreement supported Plaintiff's argument regarding discrimination against him on the basis of race, the harm Plaintiff incurred as a result of this "discrimination" is minimal.  Plaintiff testified to the following with regard to how many days he has been affected by restrictive lockdowns:

> Q:     Okay. How many days has it been? And tell me which days and how long, please.
> A:     There's been quite a few lock-downs.
> Q:     Well, just–I'm sorry. I didn't mean to interrupt you. Just as to you, Mr. Walker, that you've been affected by.
> A:     Maybe 10 days.

(Evid. Hr'g Tr. 64.) Considering the incidents at issue occurred over a period of approximately one year, a period of ten days under lockdown following incidents of riots and attempted murder is not a severe restriction on Plaintiff's activities amounting to breach of the terms of the Settlement Agreement. The Court interprets the intent and scope of the agreement by focusing on the circumstances under which the agreement was made. Lloyd's Underwriters, 26 Cal.App.4th at 1197-1198. In addition, "particular clauses of a contract are subordinate to its general intent." Cal. Civ. Code § 1650. Plaintiff admits that at Calipatria State Prison, lockdowns continued for periods of "two weeks, sometimes a week, sometimes two months, sometimes six months, sometimes eight months." (Evid. Hr'g Tr. 64.) The Court determines that the parties' general intent when entering into the Agreement was to alleviate Plaintiff's situation at Calipatria State Prison, thereby relieving him from having to remain on restrictive lockdown for months at a time. Taking into account the specific circumstances which prompted Plaintiff's initial litigation, ten days constitutes de minimis restriction at best.

Therefore, based on the record before it, the Court is not convinced that Defendants' conduct with regards to placing Plaintiff in restrictive lockdown amounts to a breach of the parties' Settlement Agreement. Plaintiff's Motion as to this Provision is DENIED.

**B.  Noncompliance With Terms of Settlement Agreement Regarding Implementation of Policy of Individual Accountability**

Plaintiff next argues that Paragraph 5 of the Agreement was violated by Defendants' failure to implement and adhere to a system-wide policy of individual accountability. Paragraph 5 states:

> 5. The Parties enter this Agreement, in part, because the CDCR, through its current administration, is committed to moving and is moving towards a behavior based system of accountability, where each inmate will be held accountable for his own individual conduct. Each inmate is to be held accountable for his own conduct, not that of other inmates of the same race. The CDCR adopted a goal to help reach this end, attached as Exhibit A to this Agreement and incorporated here by reference.

Exhibit A to the parties' Agreement is a statement of goals and strategies seemingly aimed at promoting crime prevention and safety within the correctional system. The document outlines strategies and dates presumably by which the particular strategies will be implemented. Of

importance to this situation is Strategy 5.3 which states: "Continue to evaluate and improve safety and security of facilities for both staff and offenders by January 2007." (Mot. Ex. A-A.) Plaintiff argues that, taken as a whole, this provision and the attendant Exhibit require Defendants to have in place a "behavior-based" system of accountability such that restrictive lockdowns are limited only to those whose behavior makes them accountable for the violent altercation.

When a contract is written, the Court looks first to the words used by the parties. <u>Powerline Oil Co., Inc. v. Superior Court</u>, 37 Cal.4th 377, 396 (2005) ("Where contractual language is clear and explicit, it governs.") Here, the provision specifically states: "The Parties enter this Agreement, in part, because the CDCR, through its current administration, is committed to moving and is moving towards a behavior based system of accountability[.]" It appears the language of the provision at issue imposes no requirement upon Defendants to implement any particular system. Rather, this appears to be a statement of intent as an explanation for why the parties entered into this agreement as a whole. The incorporation by reference of Exhibit A to the Settlement Agreement further solidifies that definition. Exhibit A is a statement of goals and projected strategies by which to attain these goals within the Department of Corrections. Such goals and strategies required for successful attainment would appear to be in accordance with "moving towards a behavior based system of accountability."

Moreover, Defendants submit that Section 55015.8 of the Department Operations Manual ("DOM") was updated to reflect implementation of such a policy of individual accountability in compliance with the terms of the settlement agreement. By way of explanation, Section 55015 of the DOM provides institutional facilities with standardized procedures and guidelines to ensure a safe and effective unlock implementation following a lockdown. (Confidential DOM 55015-2.)   Section 55015.8 states:

> Upon successful containment of an incident, disturbance or disaster, assessment of the causes and determination of program activity status shall begin. Depending upon the seriousness of the situation, it may be advisable to modify/restrict program activities.
>
> Such modifications/restrictions shall be considered after the identification of the disruptive groups, sub groups, or individuals. The identification of said inmates must be based on the behavior that caused the consideration for the program

> modification/restriction, and upon substantiated belief that the negative or combative behavior will continue. When attempting to identify involved inmates, the determination cannot be based solely on ethnicity. When determining any inmate's involvement and lockdown status the determination must be based on the individual's documented case factors, their behavior, or upon an informed prediction of their behavior.
>
> In emergency situations, and on a short-term basis, inmates may be separated on the basis of ethnicity for security purposes, so long as it is not done preferentially, or as a punitive measure. A short-term basis is generally considered to be up to two weeks, fourteen (14) calendar days, although this may vary depending on the specific incident/disturbance or other emergency.
>
> The options of the modified program, lockdown, or State of Emergency provides for the safe control of inmate movement, restricts potentially volatile persons or groups. and affords additional time to evaluate overall operations.
>
> It is important that all groups are dealt with in a fair and consistent manner commensurate with their involvement, and circumstances of events causing the lockdown, in any incident. Appropriate controls should be applied to the affected inmates and area(s), minimizing the reduction of operations and services in unaffected area(s).

(Id.) By having such guidelines in place and adhering to them, Defendants are affirmatively meeting the obligations imposed upon them by the relevant provision of the Agreement. To further support Defendant's contentions, Captain Machado testified at the Evidentiary Hearing that DOM Section 55015.8 is an updated policy (Evid. Hr'g Tr. 144:19-21) and that he intends to comply with it in the future in his capacity as Facility Captain. (Id. at 126:21-23.) In light of these facts, the Court cannot find a violation of this particular provision of the Agreement.

Plaintiff also argues that he "entered into the Agreement because the Defendants were committed" toward implementing a behavior-based system of accountability. (P. & A. 6.) To that end, Plaintiff testified that based upon his understanding of Escalera v. Terhune, 2004 WL 238763 (Cal.App.1 Dist.)(unpublished), he understood the Department of Corrections would "come up with a behavior-based system of accountability, meaning that they would recognize two different categories of inmates, those who [] wanted to follow the rules and those who didn't [] and they would deal with them accordingly." (Evid. Hr'g Tr. 28:4-10.) While Plaintiff may have entered into the agreement believing that a change in policy would occur in the prison system within a specified time, the words of the contract provision at issue do not reflect that intent. Contractual interpretation "turns on what was intended [by the parties] by what was

said–not what a party intended to say." <u>Falkowski v. Imation Corp.</u>, 132 Cal.App.4th 499, 506 (2005).  Here, no projected date for implementation was written into the provision nor was there any such duty to fully implement a policy.  Rather, the parties intended for the Department of Corrections to begin *moving towards* a policy of behavior-based accountability which they have done by adopting goals stated in Exhibit A to the Settlement Agreement and updating DOM to reflect this initiative.

Alteratively, if Plaintiff intended for Defendants to adhere to the principles of <u>Escalera</u>, Defendants have done so.  <u>Escalera</u>, as affirmed by the California Appellate Court, ordered appellants to take the following steps following a riot in 2000:

> (1) Refrain from affording preferential treatment to inmates on the basis of ethnicity. *In their discretion, the [appellants] may lockdown the prison, and may release inmates from lockdown based upon individual behavior, and upon informed predictions of individual behavior; but not on the basis of ethnicity.* On a short-term emergency basis, [appellants] may separate inmates on the basis of ethnicity, if prison security requires it, so long as it is not done preferentially. ... ;
> (2) Allocate sufficient resources to promptly complete the evaluation of inmates who remain on lockdown as a result of the February 23, 2000 riot, to determine, on an individual basis, and without ethnic preference, which inmates may safely be released from lockdown, and which should be placed in the Security Housing Unit. ... ;
> (3) Prepare a plan to improve race relations among inmates, and to overcome the 'culture of separation' so as to reduce the likelihood of ethnic violence within [Pelican Bay State Prison]."

<u>Escalera v. Terhune</u>, 2004 Cal. App. Unpub. LEXIS 1293, 9-10 (Cal. App. 1st Dist. 2004) (emphasis added).  The record before the Court shows that inmates at Mule Creek are not afforded preferential treatment on the basis of ethnicity because the inmates that are removed from restrictive lockdown first are the ones who have been cleared of personal involvement in or knowledge of the violence that prompted the lockdown.  Defendants appear to be completing their investigations following the lockdowns in order to clear certain groups of prisoners because no lockdown or denial of privileges has extended longer than 14 days.  (Evid. Hr'g Tr. 126:14-15.)  Lastly, Exhibit A to the Settlement Agreement contains goals and strategies which demonstrate Defendants' movement towards crime prevention and safety of the correctional institutions.

Although Defendants have shown they are moving towards a behavior-based system of

accountability, there are still times when race determines initial lockdown status within the corrections system. However, this alone is not sufficient to be determined a violation of the terms of the Agreement. Prison authorities have the right, "acting in good faith and in particularized circumstances, to take into to account racial tensions in maintaining security, discipline, and good order in prisons and jails." Lee v. Washington, 390 U.S. 333, 334 (1968). This is precisely what the Department of Corrections is doing when attempting to protect inmates and prison staff from violent individuals within the prison system. The Supreme Court has stated: "Prisons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts." Johnson v. California, 543 U.S. 499, 515 (2005). Special circumstances are surely present immediately following riotous activity between inmates and the CDCR is in a better position to determine the proper timeframe for implementation of an innovative policy. This Court refuses to employ an interpretation of the terms of the Agreement which would result in unjust and harsh conditions to other California prisoners who wish to remain safe following violent inmate altercations. Accordingly, Plaintiff has not shown a violation of the terms of Paragraph 5 of the Agreement and Plaintiff's Motion as to this provision is DENIED.

### C. Retaliation Against Plaintiff by Counselor Hamilton

Plaintiff's third argument centers around the actions of Counselor Hamilton, Plaintiff's Correctional Counselor at Mule Creek. Plaintiff alleges Ms. Hamilton has retaliated against him, in direct violation of Paragraph 4 of the Agreement. More specifically, Plaintiff alleges two actions that constitute retaliation: 1) on one occasion, Ms. Hamilton asked him if he would like to volunteer to transfer to High Desert State Prison; and 2) Ms. Hamilton stayed in her office on ten occasions while he spoke to his attorneys on the telephone.

The Court finds Plaintiff's first claim of "retaliation" to be without merit. Plaintiff's account of the incident is as follows:

> Q: And can you describe the circumstances under which she asked you? Like did she ask you as part of a regular visit that you had with her or was it under different circumstances?
> A: Different circumstances. I was standing out in the morning waiting to go to the law library. It was around almost 8:00 o'clock, I believe, and she was just coming in to work. She was coming in to work. She had her– they

> usually carry–push a cart with inmates' files on their way to their office in the housing unit. And she kind of looked up and saw me standing there and said, hey, do you want to transfer to Mule Creek -- I mean to High Desert? And I kind of looked at her like, why would you ask me that? So I kind of walked up to her and asked her, you know -- she said, I wanted to know if you wanted to go to Mule Creek -- I mean High Desert. I said, well, no, I'm not interested. And she kept walking, and I walked back in the other direction.

(Evid. Hr'g Tr. 45: 13 - 46:5.) Plaintiff then stated: "I went to her office the next day and asked her, you know, were you serious? Because, you know, I couldn't–and she said, yes, I was serious. We need people to go." (Id. at 47:10-13.) The exchange attested to by Plaintiff corroborates Ms. Hamilton's assertion that she merely asked Plaintiff if he would like to transfer to High Desert because:

> Inmate Walker is currently housed on a sensitive-needs Level 4 facility. High Desert State Prison had just opened a Level 4 sensitive-needs facility which is comparable to our facility that inmate Walker is assigned to at this point. We were told -- we, as counselors, were told by our supervisors and by the classification services unit, which is our headquarters in Sacramento, that we were to send an X amount of inmates to High Desert to facilitate the opening of their Level 4 facility. We were to go and ask inmates – take volunteers to High Desert initially before we started involuntary transfers because the Department is under a strict time line to get this population up in that particular prison.

(Evid. Hr'g Tr. 90:11-24.) Merely asking someone if they would like to "volunteer" for a transfer is not a retaliatory act. A retaliation claim generally requires the prisoner to show that the action does not further any legitimate penological goal. Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994)(per curiam). Here, the act of asking Walker if he would like to volunteer for a transfer was simply because a new facility was in place and inmates were needed to successfully operate it. Moreover, Ms. Hamilton testified that she asked the same question of other inmates and she posted a sign on her office window conveying the same inquiry she posed to Walker. (Evid. Hr'g Tr. 90:25 - 91:6.) Most importantly, Plaintiff was never transferred to High Desert State Prison and remains at Mule Creek today. The Court does not find that Plaintiff's first allegation amounts to retaliation.

Plaintiff's second allegation is based on Ms. Hamilton's presence while he completed confidential telephone calls in her office. Plaintiff alleges Ms. Hamilton eavesdropped on his conversations with his attorney because she stayed in the room with him and on one occasion,

1  she asked him a specific question about the content of his call.  Ms. Hamilton counters that she
2  could not leave him alone in her office because it has a locking door and there is a possibility
3  that if left alone, Plaintiff could barricade himself in the room.  (Evid. Hr'g Tr. 87:22-88:3.)
4  Further, Ms. Hamilton states that she has confidential files and materials pertaining to other
5  inmates both on paper and in the computer in her office.  (Id. at 88:3 - 88:14.)  Leaving Plaintiff
6  alone in the room is a potential breach of security because he would have access to those files.
7  (Id.)  Ms. Hamilton also states she never asked about the confidential content of his call, but
8  rather whether he said "I love you" at the end of a conversation because she wanted to make sure
9  he was not speaking to any unauthorized individual.  (Evid. Hr'g Tr. 105:18 - 106:6.)
10     The Court finds no retaliation with regards to this claim.  Plaintiff's only reason for taking
11 calls in Ms. Hamilton's office was likely to circumvent the monitored telephones available to all
12 inmates for personal calls.  By allowing Plaintiff the use of her office telephone, Ms. Hamilton
13 was doing Plaintiff a favor and allowing him to maintain the confidentiality of his legal
14 conversations.  It appears reasonable that Ms. Hamilton could not leave Plaintiff alone in her
15 office with the presence of confidential information about other inmates which Plaintiff could
16 potentially use to his advantage on the prison yard.  If Plaintiff wanted truly confidential
17 conversations with his attorney, an in-person meeting at Mule Creek would have served that
18 purpose.  Plaintiff has failed to rebut Ms. Hamilton's legitimate penological reason for staying in
19 the room while he made his calls.  See Barnett, 31 F.3d at 815-16.  Furthermore, the record
20 shows Plaintiff never made any concern with regard to this situation known either to Ms.
21 Hamilton or to prison authorities by filing a grievance form.
22     Plaintiff's unsupported allegation that he was retaliated against for a successful lawsuit is
23 not a sufficient basis to find a violation of the parties' agreement.  Relief with respect to these
24 claims is DENIED.
25 / /
26 / /
27 / /
28 / /

## VI.
## CONCLUSION

The Court finds Plaintiff has made no showing that Defendants have engaged in actions that amount to a violation of the terms of the Settlement Agreement. Based on the foregoing, Plaintiff's Motion to Enforce Settlement Agreement and for Sanctions is DENIED.

DATE: <u>March 11, 2009</u>

_____
Peter C. Lewis
U.S. Magistrate Judge
United States District Court